THE COLORADO FLORIDA LAND COMPANY, *Plaintiff in Error,* v. W. A. ROEBUCK, *Defendant in Error.*

## Opinion Filed December 9, 1919.

Where one enters upon a tract of land owned by the State and makes improvements upon it, builds a house and lives in it and plants trees upon the land and cultivates the soil, but makes no effort to purchase the land from the State, and waits to purchase from any one who may buy from the State, cannot assert against such purchaser the settlement upon and improvement of the land as the basis of an estoppel from the assertion of title. Such settler must rely upon a contract in writing for the conveyance of the land or base his right to retain possession upon an estoppel growing out of such conduct on the part of the purchaser as induced the settler to take a position or pursue a course detrimental to him that he would not otherwise have taken or pursued.

A Writ of Error to the Circuit Court for Palm Beach County; E. B. Donnell, Judge.

Judgment reversed.

*H. L. Bussey,* for Plaintiff in Error;

*A. R. Roebuck,* for Defendant in Error.

ELLIS, J.—The Colorado-Florida Land Company, herein-after referred to as the plaintiff, brought an action of ejectment in the Circuit Court of Palm Beach County against W. A. Roebuck, who will be referred to herein as the defendant.

The property involved in the litigation consists of one hundred acres of land. Forty acres of which being in the Northwest quarter of Section 24, in Township 39 South, Range 40 East, and sixty acres being in the Northeast quarter of Section 7, in Township 39 South, Range 41 East.

The defendant interposed two pleas. The first was the plea of not guilty, the second was called an equitable plea. Issue was joined upon the first plea and the plaintiff's replication to the equitable plea and the parties went to trial.

During the progress of the trial the defendant withdrew the equitable plea and so rested his defense on the plea of not guilty. The plea purported to set out a history of the defendant's claim and set up the equity which he conceived to be his under the circumstances as a defense against the plaintiff's title.

There was a verdict and judgment for the defendant and the plaintiff seeks a reversal upon writ of error.

There was a motion for a new trial which was overruled. According to the view we take of this case, it will not be necessary to discuss the many questions which arose upon the admission and rejection of evidence and the giving and refusing of charges.

The facts in the case so far as the land itself is involved are in substance as follows: It passed to the State of Florida under the Act of Congress of September 28th, 1850, known as the Swamp Land Grant Act and was included in a patent from the United States dated September 27, 1858. Under the Act of 1855, Chap. 610, this land became part of the Internal Improvement Fund and the title became vested in the Trustees of that Fund for the State. In December, 1906, the land was included in a deed from the Trustees of the Internal Improvement Fund to the Florida Coast Line Canal and Transportation Company, but the deed was placed in escrow and not delivered until November, 1912. On the 26th day of November, 1912, the Canal Company conveyed the lands by deed to The Colorado-Florida Land Company, a Colorado Corporation, authorized to do business in this State.

As to the defendant's claim, it is based upon an alleged contract between him and W. H. Terry, an officer of The Colorado-Florida Land Company, for the sale by the Company and purchase by the defendant of the land described in the declaration. The defendant's claim originated in a transaction between him and a Mr. Carlton, who in 1906 had been living upon the land, cultivating a portion of it and using it as if it were his own for many years. During all these years Carlton had had the use of the land. It does not appear that he paid either rent or taxes to the State. In 1907 he sold his "claim" to the defendant, but at that time the title to the land was still in the State. The defendant, who, after the purchase of Carlton's claim, moved himself and family upon the land, took possession of the improvements that he found upon it, made others and established himself as proprietor. In December, 1911, the defendant met Mr. Terry and told him

that he, the defendant, had arranged for four hundred acres of land, but Mr. Terry said that defendant should not "go any further with those people," but let him buy the land and he would let defendant have it at the identical price at which it may be sold to Terry. In December, 1912, Terry said to the defendant that the land had advanced in price two dollars an acre, that the land would cost five dollars and a half per acre. To this the defendant assented and afterwards asked for a deed. It appears from the defendant's testimony, that afterwards he agreed with Mr. Terry to reduce the quantity of land at first selected by him to one hundred acres and Mr. Terry had it surveyed or "laid out" as the defendant said, by a Mr. Butler. According to the defendant, Mr. Terry promised to have the deed executed and returned to the defendant, but never did it. In April, 1914, the defendant exhibited his bill in the Circuit Court for Palm Beach County against The Colorado Florida Land Company to quiet the title to the land involved in this suit in which he claimed to have entered into possession of the land under purchase from D. S. Carlton and set up possession for seven years under claim of title. In other words, in that bill the defendant set up title to the land by adverse possession as against the plaintiff in this cause.

The defendant while upon the stand as a witness in his own behalf was permitted over the plaintiff's objection to testify as to conversations between him and Mr. Terry about the lands and the defendant's "claim" that occurred prior to the year 1912. The defendant testified that in 1913 Mr. Terry told him that he, Terry, got his deed in December, 1912, that the defendant was now safe and would get his "title" just as soon as they could get the land surveyed, and that Terry would never get

through paying defendant for helping Terry to sell to Mr. Greenlees. In this connection, however, the defendant testified that the price that Mr. Terry wanted defendant to pay for the land was two dollars more than he expected to pay and that he "of course opposed it," saying that it was not fair. It appears, however, from this testimony that there was no definite understanding between the parties as to the price to be paid for the land and who was to convey it; whether the Colorado Florida Company or the person to whom it was at that time negotiating for the sale of a large tract of land in the same township and range at nine dollars per acre.

The Colorado Company, however, effected a sale to Mr. Greenlees and omitted from the description of lands sold to him the one hundred acres claimed by defendant. This deed was executed in December, 1912. In February, 1913, according to the defendant, they began the work of surveying the land sold to Greenlees, the defendant having been employed as a kind of assistant. The sixty acres of land at his house were surveyed and Mr. Terry said that he would send the deed, to which the defendant replied that he would submit his bill and they "could settle up." There were other conversations in 1914, in which, as the defendant said, Mr. Terry explained why he had not sent the deed. These occurred, however, before the suit to quiet title brought in April, 1914.

There have been no other conversations since between them relating to the land in controversy. During that year the defendant also brought an action on the common law side of the court against the Company to recover for services rendered during the period covered by the negotiations between Mr. Terry and Mr. Greenlees. The defendant performed some service for Mr. Terry in the matter of aiding in the location of corners, transporting

the party over the lands, furnishing board and lodging and supplying teams. There was no memorandum made in writing of the agreement between the defendant and the plaintiff through Mr. Terry or any one else; there was no agreement between them as to the price to be paid for the land; there has been no tender of any money by the defendant to the plaintiff; the defendant, as late as April, 1914, some time after the alleged contract between him and Mr. Terry was made, was asserting in court adverse title to the land against the plaintiff, nor has there been any tender in court of the purchase price of the land even according to the defendant's view of what it amounted to.

We do not find in this evidence any element of an estoppel as against the plaintiff. If it is admitted to be true that Mr. Terry, in December, 1912, or during the year 1913, told Mr. Roebuck that the latter could have the land for $3.50 per acre or $5.50 per acre or at any price and afterwards declined to sell for that price, upon what theory could the defendant, Roebuck, recover the land? If, after making the agreement, he had in good faith moved upon the land and made improvements by permission of the owner, it might with some reason be claimed by the defendant that the owner was estopped by his behavior from denying, not his title, but his contract of sale. In this case the defendant was in possession of the land when the plaintiff purchased it from the Canal Company. He was not holding adversely because he could not hold adversely to the State. The defendant had made most of his improvements upon the land before he began negotiations with Mr. Terry for the purchase of it. There is some reference to his moving his house forward a few feet after he met Mr. Terry. But it does not appear from the evidence that he went to any expense or trouble or did

anything to place him in a worse position than he was before he talked to Mr. Terry.

The defendant was in the position of one who, not owning a tract of land, but knowing that it belongs to the State, enters upon it, improves it, builds his house upon it, plants trees and cultivates the soil and moves his family into the house in the hope of buying the land at a reasonable price from anyone who should purchase it from the State. If the State's grantee promises in writing for a consideration to sell the land to him at a certain price, the contract can be enforced; or if the owner by his conduct induces the settler to take any position or pursue any course detrimental to himself that he would not otherwise have done, the former may be estopped from denying his utterance or act to the loss of the latter. In this case we discover from the evidence no estoppel as against the plaintiff from setting up its title to the land as against the defendant.

The plaintiff's request for the affirmative charge should have been given, because there was no evidence to show the existence of a contract between the plaintiff and defendant for the purchase of the land to which the statute of frauds does not apply; nor to show any estoppel against the plaintiff from asserting title; nor to show any tender of the purchase price of the land by the defendant; nor to show any legal title in the defendant to the land in controversy.

The judgment is therefore reversed.

BROWNE, C. J., AND TAYLOR, WHITFIELD AND WEST, J. J., concur.